**William A. HERITAGE, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–17763.**

Court of Criminal Appeals of Oklahoma.

Nov. 8, 1972.

Don Anderson, Public Defender, Oklahoma County, for appellant.

Larry Derryberry, Atty. Gen., for appellee.

BUSSEY, Presiding Judge:

Appellant, William A. Heritage, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma for the offense of Assault and Battery With a Deadly Weapon With Intent to Kill; his punishment was fixed at twenty (20) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Pearl Ramsey testified that she was seventy-four (74) years of age and that on December 4, 1971, she lived at 905 N.E. 21st Street. The defendant rented a room in her house on May 7, 1971. She and the defendant were on very good terms and spent many evenings reading the Bible together. On the evening of December 3, 1971, she and the defendant had been visiting together when defendant left saying he had to get some air in his tires. About three or four o'clock the next morning the defendant called to her from the driveway and stated, "that some men were after him" and asked her to, "call the law." When the officers arrived the defendant said, "them men there are after me. Can't you see that man sitting in that car?" The police replied, "there is no man in the car." (Tr. 6). About nine o'clock that morning she went to get her newspaper from the porch, and observed the defendant lying on the divan in the living room. Defendant had accused her the previous night of having "the wife and daughter hidden in the house." The defendant stated, "I see you let them out." She told the defendant to go back to his room and go to bed.

The defendant later knocked on her bedroom door and asked to use her telephone. The defendant came into the room carrying a hammer in his hand. She asked the defendant what he was going to do with that hammer and the defendant stated,

"I'm going to kill you with it." She replied, "kill me, I haven't ever done anything to you in my life." The defendant stated, "you have tipped them off." The defendant picked up the telephone and said, "If they don't answer I am going to start in on you with this hammer." The defendant dropped the receiver and twisted her arm behind her back and started hitting her with the hammer. She attempted to shield her head with her hand and the defendant continued striking her. She told the defendant he was killing her and the defendant replied, "thats exactly what I intend to do." After approximately five to ten minutes defendant dropped the hammer and struck her with the telephone. The defendant said, "I will sit here now and watch you bleed to death." She testified that she didn't move because she was afraid he would strike her again. She was subsequently taken to the hospital where she remained for twenty-four days. Forty-one stitches were taken in her head.

Officer Carruth testified at approximately 10:22 a. m., he answered a call to 905 N.E. 21st Street. He observed the defendant clad in pajamas covered with blood, standing on the porch, waving his arms. The defendant advised them that the lady inside was dead. Officer Carruth entered the house and observed Mrs. Ramsey lying on the floor beside the bed. The room was covered with a large amount of blood. He observed a broken telephone receiver and a bloody hammer on the bed.

Officer Connelly testified that he was assigned to the Crime Lab. Division of the Oklahoma City Police Department. He identified pictures which were taken of the interior of Mrs. Ramsey's house and pictures of the defendant. He further took custody of the physical evidence at the scene.

Dr. Carl Hooks testified that he treated Mrs. Ramsey at the emergency room of St. Anthony Hospital on the morning in question. She was in a state of shock and had bleeding points on both hands and multiple bleeding points from the head. He estimated that she had lost three or four pints of blood.

Officer Perkins testified that he arrived at the scene with Officer Carruth. He observed the defendant standing in the doorway with blood all over his clothes. The defendant stated, "that the lady inside was hurt very seriously, that she had gone crazy and tried to attack him." He also stated, "she tried to sell him some kind of dope or something like that." (Tr. 40).

The defendant testified that he was Fifty-four (54) years old and was employed as an accountant in the finance section of the Department of Public Welfare. He had a degree from Oklahoma State University and received an honorable discharge from the Air Force in World War II. He testified that he had never been convicted of a felony but had been convicted of driving while intoxicated two or three times. He testified that his relations with Mrs. Ramsey were "extremely pleasant" and that they read the Bible together almost every night. On the morning of December 4, 1971, he overheard a telephone conversation confirming what he had suspicioned for quite some time. She stated on the telephone, "I haven't talked to the supplier lately and don't you call me anymore. This place has been under surveillance too much and don't you call me anymore until you hear from me." (Tr. 46). He went into her room and informed her that he knew there was some type of drug traffic going on and that he was going to report it. She asked him to please not report it. He reached for the telephone and she grabbed the receiver and hit him on the head with it. She then struck him with the ash tray. He picked up the hammer and struck her. He testified that on direct examination as follows:

"Q. And, were you fearful after you were hit?

"A. Well, I probably can't say—I probably was not afraid. I was just struggling and it was impulse more than good judgment, but I did get

the hammer and I have no intention of ever denying I struck Mrs. Ramsey." (Tr. 48).

He denied bringing the hammer into the room and denied making threats that he was going to kill her.

The first proposition asserts that the verdict is not supported by evidence. We have consistently held that where there is competent evidence in the record from which the jury can reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom. It is the exclusive province of the jury to weigh the evidence and determine the facts. Jones v. State, Okl.Cr., 468 P.2d 805.

The final proposition contends that the punishment is excessive. From the foregoing statement of facts, we are of the opinion that the punishment imposed, although the maximum is not excessive. The judgment and sentence is affirmed.

BRETT, J., concurs.